**TIME WARNER ENTERTAINMENT CO., L.P., Appellant/Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and The United States of America, Appellees/Respondents,**

**Association of America's Public Television Stations, et al., Intervenors.**

Nos. 93–5349, 93–1266, 93–1384, 93–5350 & 93–5351.

United States Court of Appeals, District of Columbia Circuit.

Argued November 20, 1995.

Decided August 30, 1996.

Robert D. Joffe and Stuart W. Gold, New York City, argued the cause for appellants. With them on the briefs were Stephen S. Madsen, New York City, Brian Conboy, Theodore C. Whitehouse, and Albert G. Lauber, Jr., Allan A. Tuttle and Peter V. Lockwood, Washington, DC, entered appearances.

Jacob M. Lewis, U.S. Department of Justice, argued the cause for respondents. With him on the briefs were Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, Mark B. Stern, U.S. Department of Justice, William E. Kennard, General Counsel, Federal Communications Commission ("FCC"), and Christopher J. Wright, Deputy General Counsel, Daniel M. Armstrong, Associate General Counsel, and Clifford G. Pash, Jr., Counsel FCC. Douglas N. Letter, Litigation Counsel, Barbara L. Herwig, Assistant Director, Bruce G. Forrest, and R. Craig Lawrence, Assistant United States Attorney, and Renee Licht, Sue A. Kanter, and Gregory M. Christopher, Counsel, FCC, entered appearances.

John F. Duffy, Washington, DC, argued the cause for intervenors Association of America's Public Television Stations, et al. With him on the brief were Mark H. Lynch, Marilyn Mohrman–Gillis, Washington, DC, Paula A. Jameson, New york City, and Nancy H. Hendry, Washington, DC.

William R. Malone, Washington, DC, argued the cause for intervenors National Rural Telecommunications Cooperative, et al. With him on the joint brief were Joseph L. Van Eaton, John B. Richards, Arthur S. Garrett, III, Lawrence R. Sidman, Washington, DC, Edward J. Perez, Los Angeles, CA, Patrick J. Grant, Washington, DC, Stephanie M. Phillips, Carl A. Fornaris, Miami, FL, and Paul J. Sinderbrand, Washington, DC. Sheila A. Millar and John B. Richards, Washington, DC, entered appearances for intervenor

National Rural Telecommunications Cooperative. Teresa D. Baer, Washington, DC, entered an appearance for amici curiae The Alliance for Communications Democracy and City of Los Angeles, California. Robert A. Garrett, Washington, DC, entered an appearance for amici curiae City of New York, et al.

David U. Fierst and James E. Meyers, Washington, DC, were on the brief for intervenor Encore Media Corporation.

Angela J. Campbell, Andrew J. Schwartzman, and Gigi B. Sohn, Washington, DC, were on the brief for amici curiae Consumer Federation of America, et al. Douglas L. Parker entered an appearance.

John Thorne, Michael E. Glover, and James R. Young, Arlington, VA, entered appearances for amicus curiae Bell Atlantic Corporation. Edward P. Kearse, Syracuse, NY, entered an appearance for amicus curiae National Association of State Cable Agencies. David B. Goodhand, Elliot M. Mincberg, I. Michael Greenberger, and James N. Horwood, Washington, DC, entered appearances for intervenors Alliance for Community Media, et al.

Before BUCKLEY, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the Court filed PER CURIAM.

Opinion dissenting in part filed by Circuit Judge TATEL.

PER CURIAM:

These are facial challenges to nine provisions of the Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, 106 Stat. 1460 ("1992 Act"), and two provisions of its predecessor, the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779 ("1984 Act"). A group of cable television system owner/operators and programmers contend that the following provisions infringe upon their First Amendment right to freedom of speech: sections 611 (public, educational, and governmental programming) and 612 (leased access) of the 1984 Act, and sections 3 (rate regulation), 10(d) (obscenity liability), 11(c) (subscriber limitation, channel occupancy, and program creation restrictions), 15 (premium channel preview notice), 19 (vertically integrated programming), 24 (municipal immunity), and 25 (direct broadcast satellite set-aside) of the 1992 Act.

We sustain the constitutionality of these provisions, with the exception of section 11(c)'s "program creation provision." We hold that the challenge to this portion of section 11(c) is not ripe for judicial decision, and we consolidate the remaining challenges to section 11(c) with *Time Warner Entertainment Co. v. FCC*, No. 94–1035, which addresses the same issues and is being held in abeyance pending reconsideration by the Federal Communications Commission of regulations contested in that action.

I

BACKGROUND

The first cable television systems were built in the late 1940's to carry broadcast television signals to communities in remote or mountainous areas. They were intended to enhance broadcast television, not to compete with or replace it. *Turner Broadcasting Sys., Inc. v. FCC,* — U.S. —, —, 114 S.Ct. 2445, 2451, 129 L.Ed.2d 497 (1994) ("*Turner*"). The industry quickly developed, however, and by the 1970's cable systems began to carry not only television broadcast signals but also new programming designed specifically for cable. H.R. REP. No. 934, 98th Cong., 2d Sess. 20–21 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4658.

Broadcast and cable television are distinct in their operations. While broadcast stations emit electromagnetic signals from a central antenna that are picked up by television sets within the antenna's range, in cable systems the transmitter is physically connected to the sets of individual subscribers by conventional or optical fiber cables that are similar in function to telephone lines. Because these cables must be laid in public rights-of-way and easements, cable operators must secure the necessary permits from local governments. Thus, their operations must be franchised.

The cable industry is comprised of cable operators, who own the physical assets and franchises and transmit the signals, and cable programmers, who produce programs for sale or license to the operators. Cable operators will often have ownership interests in programmers, and vice versa. These are known as "vertically integrated" entities. Cable operators create some of their own programming, but much of it comes from outside sources, including local and distant broadcast stations and such national and regional cable programming networks as CNN, ESPN, and C–Span. Cable subscribers select the stations they wish to receive by choosing among various plans ("tiers") of cable service. At an additional cost, a subscriber may receive "premium" channels (such as HBO and Showtime). Many systems also offer "pay-per-view" programs for which a subscriber pays a fee each time a specific movie or program is selected.

Prior to 1984, cable television was largely regulated at the local level, primarily through the franchise process. H.R.REP. No. 934, *supra*, at 19, *reprinted in* 1984 U.S.C.C.A.N. at 4656. The 1984 Act established a national policy for the local, state, and federal regulation of cable; but it continued to rely on local franchising as the primary means of regulation. *Id.*

The 1984 Act authorized local governments to require cable operators to set aside channels for public, educational, and governmental ("PEG") programming. *Id.* It also required operators of cable systems with more than 36 channels to set aside a percentage of those channels for commercial use by entities unaffiliated with the operator ("leased access"). *Id.* at 48, *reprinted in* 1984 U.S.C.C.A.N. at 4685. The Act also allowed local authorities to regulate rates for basic cable services if a cable system did not face effective competition. *Id.* at 19, *reprinted in* 1984 U.S.C.C.A.N. at 4657. The FCC defined "effective competition" in such a way, however, that 97 percent of all systems were exempt from rate regulation. S. REP. No. 92, 102d Cong., 2d Sess. 4 (1991), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1136.

The cable industry experienced dramatic growth following the enactment of the 1984 Act, and Congress was soon confronted by the problems that accompanied this growth. Accordingly, it launched a two-year review of the industry. This study laid the ground for the passage of the 1992 Act, which revised certain provisions of the 1984 Act, left others in place, and enacted a number of new provisions. We will refer to the two statutes collectively as "the Cable Acts."

Soon after the new legislation was enacted, the FCC initiated a rulemaking to implement and interpret section 10. *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992: Indecent Programming and Other Types of Materials on Cable Access Channels*, 7 F.C.C.R. 7709 (1992) (notice of proposed rulemaking). At the conclusion of the rulemaking, the FCC issued two orders construing section 10 and promulgating regulations to implement it. *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992: Indecent Programming and Other Types of Materials on Cable Access Channels*, 8 F.C.C.R. 998 (1993) (first report and order); *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992: Indecent Programming and Other Types of Materials on Cable Access Channels*, 8 F.C.C.R. 2638 (1993) (second report and order). Time Warner petitioned this court to review these orders.

Shortly after the FCC initiated its rulemaking, five lawsuits challenging various provisions of the Cable Acts were filed in the United States District Court for the District of Columbia. After these cases were consolidated, the challenges to two provisions were severed and assigned for hearing by a three-judge panel of the district court in accordance with section 23 of the 1992 Act, 47 U.S.C. § 555(c)(1). *See Turner Broadcasting Sys., Inc. v. FCC*, 810 F.Supp. 1308 (D.D.C.1992). A single-judge district court proceeded to consider the remaining issues, which are those that now concern us, and concluded that three of the challenged provisions were unconstitutional (the DBS set-aside obligation, the premium channel preview notice requirement, and the subscriber limitation), *Daniels Cablevision, Inc. v. United States*, 835 F.Supp. 1, 8–10 (D.D.C.1993),

but upheld the validity of the rest. *Id.* at 5–7, 10–12.

In this proceeding, the government appeals the district court's holdings of unconstitutionality while Time Warner, Discovery Communications, and the Learning Channel (collectively "Time Warner") appeal the remainder of its conclusions on the merits. Several parties have been granted leave to intervene, some of whom question the district court's authority to hear this case. We will deal first with the jurisdictional issue and then address the constitutionality of the challenged provisions of the Cable Acts. On Time Warner's motion, we have consolidated its appeal with its petitions for review of the FCC's orders implementing section 10. Any arguments that Time Warner could have raised with regard to subsections (a)-(c) of section 10 have essentially been foreclosed by the Supreme Court's recent decision in *Denver Area Educational Telecommunications Consortium v. FCC*, —— U.S. ——, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (*"Denver"*). Furthermore, Time Warner's briefs address only subsection (d) of section 10—a self-executing provision that in no way involves FCC action—and offer no arguments challenging the validity of the orders implementing section 10's other subsections. Since this court generally does not consider issues that are not raised in the parties' briefs, we deny the petitions for review. *E.g.,* FED. R.APP. P. 28(a)(6); *El–Fadl v. Central Bank of Jordan*, 75 F.3d 668, 673 (D.C.Cir.1996); *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983).

## II

### JURISDICTION

The Communications Act, of which the Cable Acts are a part, vests the courts of appeals with jurisdiction to hear any claim "to enjoin, set aside, annul, or suspend any order of the [FCC] under" the Act. 47 U.S.C. § 402(a). In *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 78–79 (D.C.Cir.1984) (*"TRAC"*), we held that "where a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the exclusive review of the Court of Appeals."

Three intervenors (the Association of America's Public Television Stations, the Public Broadcasting Service, and the Corporation for Public Broadcasting) (collectively "PBS") cite this language in support of their claim that the district court lacked jurisdiction to hear Time Warner's constitutional challenges to the DBS provisions. PBS submits that the relief that Time Warner sought from the district court—an order enjoining the FCC from issuing any regulation under the 1992 Act—would circumvent the process for judicial review provided for by statute. It asserts that the claims are properly raised during judicial review of the regulations the FCC will ultimately promulgate and that we should disallow "preemptory strikes" to enjoin the FCC before it can act. Although PBS's argument was aimed solely at the DBS provisions, its reasoning is applicable to all other provisions that require the promulgation of FCC regulations.

The district court addressed this issue earlier in the litigation when the plaintiffs sought an order enjoining the FCC from implementing or enforcing the challenged sections of the Cable Acts. *Time Warner Entertainment Co. v. FCC*, 810 F.Supp. 1302 (D.D.C.1992). In response to the argument that the court had no authority to issue the requested orders in light of our decision in *TRAC*, the court noted that

> the D.C. Circuit has never held in subsequent cases that *TRAC* precludes a district court from hearing a constitutional challenge to an agency's enabling act merely because the court of appeals ultimately has exclusive jurisdiction over the agency's action taken pursuant to the act.

*Id.* at 1304. The court then observed that the case "involve[d] a direct constitutional challenge to congressional legislation, which, if plaintiffs [we]re correct, could never justify future agency action to implement or enforce it," and concluded that "notwithstanding *TRAC*, district courts still have original jurisdiction to consider plaintiffs' constitutional claims such as those brought here." *Id.*

PBS maintains that this holding cannot be reconciled with *TRAC*. In that case, we asserted exclusive jurisdiction over a request

for a writ of mandamus to require an agency to exercise its rulemaking authority because section 402(a) endowed courts of appeals with sole authority to review the agency actions that were the subject of the mandamus petition. *See TRAC*, 750 F.2d at 77. PBS reasons that because Time Warner's objective in seeking an injunction was to prevent the FCC from taking any action pursuant to the challenged provisions of the two Acts, our authority under section 402(a) is implicated and, with it, *TRAC*'s assertion of exclusive authority to consider the request. PBS, however, fails to make the necessary distinction between a constitutional challenge that is exclusively directed to the source of putative agency authority and a challenge to the manner in which the agency has exercised or (as in the case of *TRAC*) failed to exercise that authority.

This distinction has been made in several cases in which courts have found it unnecessary to address *TRAC*'s applicability to constitutional challenges. For example, in *Ticor Title Insurance Co. v. FTC*, 625 F.Supp. 747 (D.D.C.1986), the plaintiffs mounted a collateral facial constitutional challenge to the agency's authority in order to enjoin an ongoing prosecution by the Federal Trade Commission. The district court held that *TRAC* did not bar it from hearing the claim because "[a] constitutional challenge to the FTC's enabling statute would not appear to be within the 'class of claims' contemplated" by the statute governing review of FTC actions. *Id.* at 749. The court subsequently dismissed the complaint on other grounds. In affirming the dismissal, we found it unnecessary to decide the *TRAC* issue. *Ticor Title Ins. Co. v. FTC*, 814 F.2d 731 (D.C.Cir. 1987). In one of the three separate opinions in that case, now-Chief Judge Edwards stated that he "need not stop to consider here whether a constitutional challenge could ever be so separate from the *underlying agency proceedings* that the district court would have jurisdiction under [the general federal question statute]." *Id.* at 743 (emphasis added). Judge Joyce H. Green, sitting by designation, went even further and stated that "*TRAC* is inapplicable to cases involving challenges to the constitutionality of an agency's enabling statute." *Id.* at 757–58.

More recently, we relied on *TRAC* to hold that the district court lacked jurisdiction to review an FTC order even though the underlying challenge was based on the "purely legal question[ ]" of FTC jurisdiction. *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 549 (D.C.Cir.1992), *cert. denied*, 510 U.S. 825, 114 S.Ct. 88, 126 L.Ed.2d 55 (1993). As in *Ticor*, the plaintiff in *Ukiah* brought the jurisdictional challenge after the FTC had issued an administrative complaint against it. We explained that "if the District Court enjoins the FTC proceeding against Ukiah as requested, 'the statutory obligation of a Court of Appeals to review [the FTC's order] on the merits may be defeated....' " *Id.* (quoting *TRAC*, 750 F.2d at 76). In contrast to *Ticor* and *Ukiah,* this case is entirely independent of any agency proceedings, whether actual or prospective. Furthermore, the application of *TRAC* to this challenge would do nothing to advance a primary policy consideration underlying that decision. As we noted in that case, "[a]ppellate courts develop an expertise concerning the agencies assigned them for review. Exclusive jurisdiction promotes judicial economy and fairness to the litigants by taking advantage of that expertise." *TRAC*, 750 F.2d at 78. Questions concerning the constitutionality of an agency's enabling statute, however, do not require any particular agency expertise.

█ We conclude, then, that Time Warner was not jurisdictionally barred from bringing this action in district court. We so hold because *TRAC* does not deprive that court of its general federal question jurisdiction to consider a facial challenge to a statute's constitutionality so long as that challenge is not raised in a suit challenging the validity of agency action taken pursuant to the challenged statute or in a suit that is collateral to one challenging the validity of such agency action.

## III

### THE RATE REGULATION PROVISIONS

Studies conducted by Congress subsequent to the passage of the 1984 Act concluded that cable operators possessed excessive market

power at the expense of consumers because of a lack of competition. *See* 1992 Act, § 2(a)(2), 106 Stat. at 1460. This was reflected in a 29 percent increase in average monthly subscriber rates between 1986 and 1992. *Id.* § 2(a)(1), 106 Stat. at 1460. As a consequence, Congress incorporated into section 3 of the 1992 Act a new definition of "effective competition," which empowers the FCC and local authorities to regulate the prices charged subscribers by the great majority of cable operators. *See* 47 U.S.C. § 543(a)(2) & (*l*)(1). The statute requires the FCC to adopt regulations that will ensure that the rates charged by the operators for their "basic service tier[s]" are reasonable, *id.* § 543(b)(1); it directs the FCC to establish criteria for determining when the rates charged for other cable services are unreasonable, *id.* § 543(c)(1); and it details the factors that the FCC must consider in carrying out these mandates, *id.* § 543(b)(2)(C) & (c)(2). Section 3 also requires cable operators to provide certain specified programming in their basic service tiers, *id.* § 543(b)(7)(A), and to maintain a uniform rate structure throughout their service areas. *Id.* § 543(d). Time Warner asserts that these provisions violate its First Amendment rights.

Subsequent to oral argument, Congress enacted the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 ("1996 Act"). Section 301 of that statute amends section 3 of the 1992 Act by, *inter alia,* phasing out the regulation of cable rates after March 31, 1999. 1996 Act, § 301(b)(1)(C), 110 Stat. at 115 (codified at 47 U.S.C. § 543(c)(3)). Because the 1992 provisions remain in effect until then, at least as to larger cable operators, *see id.* § 301(c), 110 Stat. at 116, Time Warner's challenge has not been rendered moot.

■■■■■ To review the relevant constitutional principles, "[t]here can be no disagreement on an initial premise: Cable programmers and cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment." *Turner,* —— U.S. at ——, 114 S.Ct. at 2456. Therefore, "laws that single out the press, or certain elements

thereof, for special treatment ... are always subject to at least some degree of heightened First Amendment scrutiny." *Id.* at ——, 114 S.Ct. at 2458. Laws that regulate speech based on its content or "that compel speakers to ... distribute speech bearing a particular message" are subject to strict scrutiny. *Id.* at ——, 114 S.Ct. at 2459. Such laws are presumptively invalid "and survive constitutional review only if they promote a 'compelling interest' and employ 'the least restrictive means to further the articulated interest.'" *American Library Ass'n v. Reno,* 33 F.3d 78, 84 (D.C.Cir.1994) (quoting *Sable Communications, Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989)), *cert. denied,* —— U.S. ——, 115 S.Ct. 2610, 132 L.Ed.2d 854 (1995). By contrast,

> a content-neutral [law] will be sustained if "it furthers an important, or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."

*Turner,* —— U.S. at ——, 114 S.Ct. at 2469 (quoting *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968)).

In this case, the district court upheld section 3 as a legitimate, content-neutral regulation. *Daniels Cablevision,* 835 F.Supp. at 7. Time Warner disagrees. It contends that section 3 is subject to strict scrutiny because, among other reasons, regulating cable rates inevitably affects both the content and quantity of speech by limiting the amount of money that a cable operator can spend on programming. This question, however, is no longer open. In *Time Warner Entertainment Co. v. FCC,* 56 F.3d 151 (D.C.Cir.1995) ("*Time Warner I*"), *cert. denied,* —— U.S. ——, 116 S.Ct. 911, 133 L.Ed.2d 842 (1996), in which Time Warner made nearly identical arguments in its challenge to the constitutionality of rules promulgated by the FCC pursuant to section 3, we determined that intermediate scrutiny applied. We noted that neither the rules nor the statute are predicated on the ideas expressed in cable programs: "All cable systems not facing ef-

fective competition are covered, and they are covered regardless of the content of the programs they transmit." *Id.* at 182. We specifically rejected the contention that the rate regulations affected the content of cable operators' speech and observed that, as promulgated, they "adequately insulated cable operators" from the "potential for causing incidental effects on content." *Id.* at 182–83.

We rejected strict scrutiny for another reason as well: "Strict scrutiny of laws directed only at one element of the media is unwarranted if the difference in treatment is 'justified by some special characteristic' of the medium"; we concluded "[t]hat cable rate regulation [was] so justified ... [because] most cable television subscribers have no opportunity to select between competing cable systems." *Id.* at 183 (quoting *Turner,* —— U.S. at ——, 114 S.Ct. at 2468). Accordingly, we found that "the rate regulations must be analyzed by the same 'intermediate' standard ... applied in *Turner Broadcasting.*" *Id.* at 184. On applying that standard, we concluded that the cable rate regulations "[we]re not unconstitutional [because] [t]he government has demonstrated a substantial interest in reducing cable rates and the Commission's regulations issued pursuant to section 3 of the 1992 Act are narrowly tailored to meet that interest." *Id.* at 186.

■ *Time Warner I* thus controls the level of review to be applied to section 3 in this case. Time Warner's assertion that the basic service tier requirements constitute a content-based restriction does not compel a contrary conclusion. In *Turner,* the Supreme Court held that the "must-carry" rules, which require cable systems to carry certain local commercial television stations and noncommercial educational stations, were content-neutral and subject to intermediate scrutiny. —— U.S. at ——, 114 S.Ct. at 2469. It found nothing in them that imposed a restriction, burden, or benefit "by reason of the views, programs, or stations the cable operator has selected or will select." *Id.* at ——, 114 S.Ct. at 2460. If the government may require a cable system to carry certain stations without triggering strict scrutiny, it may require them to carry those stations in

their basic service tiers without inviting a finding of content-based regulation.

Time Warner maintains, nevertheless, that section 3 fails even intermediate scrutiny because the government has not demonstrated that rate regulation will further an important or substantial government interest, and because the means employed will burden substantially more speech than is necessary. The very short but sufficient answer is that *Time Warner I* settled each of the questions. We found that the government's interest in "protecting consumers from monopoly prices charged by cable operators who do not face effective competition" was "evident," 56 F.3d at 184, and that "the rate regulations are narrow enough: rate regulation is triggered by the absence of effective competition and ceases when effective competition emerges." *Id.* at 185.

■ In that case, of course, the finding that the government met the requirements of intermediate scrutiny was concerned with specific regulations issued by the FCC pursuant to section 3, whereas this case involves a facial challenge to the section itself. But

> to prevail on a facial attack the plaintiff must demonstrate that the challenged law either could never be applied in a valid manner or that even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it may inhibit the constitutionally protected speech of third parties.

*New York State Club Ass'n v. City of New York,* 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988) (internal quotation marks and citations omitted). Time Warner does not claim that rate regulation will affect the protected speech of third parties; and it is foreclosed, by our decision in *Time Warner I,* from maintaining that the section can never be constitutionally applied.

## IV

### LEASED ACCESS PROVISIONS

In response to *FCC v. Midwest Video Corp.,* 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979), the 1984 Act compelled cable operators of systems with more than thirty-six channels to set aside between 10

and 15 percent of their channels for commercial use by persons unaffiliated with the operator. 47 U.S.C. § 532(b)(1). The larger the number of channels in the system, the greater the percentage of channels the operator must set aside.[1] "Leased access" was originally aimed at bringing about "the widest possible diversity of information sources" for cable subscribers. *Id.* § 532(a). Congress thought cable operators might deny access to programmers if the operators disapproved the programmer's social or political viewpoint, or if the programmers' offerings competed with those the operators were providing. "Diversity," as the 1984 Act used the term, referred not to the substantive content of the program on a leased access channel, but to the entities—the "sources"—responsible for making it available. *See* H.R. REP. No. 934, *supra,* at 48, *reprinted in* 1984 U.S.C.C.A.N. at 4685.

The 1984 Act gave cable operators the authority to establish the price, terms, and conditions of the service on their leased access channels. 1984 Act, § 2, 98 Stat. at 2783 (original version of 47 U.S.C. § 532(c)(1)). With respect to those channels, then, the operator stood in the position of a common carrier. *See Midwest Video,* 440 U.S. at 701, 99 S.Ct. at 1442; *Implementation of Section 10 of the Cable Consumer Protection and Competition Act of 1992: Indecent Programming and Other Types of Materials on Cable Access Channels,* 8 F.C.C.R. 998, 1001–02 ¶ 22 (1993) (first report and order). If an operator refused to provide service, persons aggrieved had the right either to bring an action in district court or to petition the Commission for relief.

47 U.S.C. § 532(d)-(e). The operator's rates, terms, and conditions were presumed reasonable, a presumption that could be overcome "by clear and convincing evidence to the contrary." *Id.* § 532(f). The operator was free to use any of the channels set aside for leased access until someone signed up. *Id.* § 532(b)(4).

The 1984 legislation did not accomplish much. Unaffiliated programming on leased access channels rarely appeared. *See* Donna M. Lampert, *Cable Television: Does Leased Access Mean Least Access?,* 44 FED. COMM. L.J. 245, 266–67 & n.122 (1992). Exactly why is uncertain. Cable operators said the reasons were high production costs and low demand in the face of the already wide array of programming operators were already providing. Others laid the blame at the feet of the operators, claiming they had set unreasonable terms for leased access. The FCC, in a 1990 report, recommended amending the 1984 Act to provide a national framework of leased access rules and to streamline the section's enforcement mechanism. *Competition, Rate Deregulation, and the Comm'ns Policies Relating to the Provision of Cable Television Serv.,* 5 F.C.C.R. 4962, 5048–50 ¶¶ 177–83 (1990) (report). The House Energy and Commerce Committee thought that cable operators had financial incentives to refuse access to those who would compete with existing programs. H.R. REP. No. 628, 102d Cong., 2d Sess. 39–40 (1992). The Senate Commerce, Science, and Transportation Committee concurred, observing that the interests of cable operators and leased access programmers were almost certain to clash.[2]

---

1. Subject to the rates, terms, and conditions established by the FCC pursuant to 47 U.S.C. § 532(c)(4), cable operators must set aside capacity for leased access as follows:

> (A) An operator of any cable system with 36 or more (but not more than 54) activated channels shall designate 10 percent of such channels which are not otherwise required for use (or the use of which is not prohibited) by Federal law or regulation.
> (B) An operator of any cable system with 55 or more (but not more than 100) activated channels shall designate 15 percent of such channels which are not otherwise required for use (or the use of which is not prohibited) by Federal law or regulation.

> (C) An operator of any cable system with more than 100 activated channels shall designate 15 percent of all such channels.
> (D) An operator of any cable system with fewer than 36 activated channels shall not be required to designate channel capacity for commercial use by persons unaffiliated with the operator, unless the cable system is required to provide such channel capacity under the terms of a franchise in effect on October 30, 1984.

47 U.S.C. § 532(b)(1).

2. The House Committee mentioned a study indicating that "there are 68 nationally delivered cable video networks, 39 of which, or 57 percent, have some ownership affiliation with the operat-

This Senate committee believed that the 1984 Act's leased access scheme suffered from "fundamental problems" and that the Act's permitting operators to establish the rates and terms of leased access service made "little sense." S. REP. No. 92, *supra,* at 30–32, *reprinted in* 1992 U.S.C.C.A.N. at 1163–65.

Amendments enacted in 1992 authorized the FCC to establish a maximum price for leased access, to regulate terms and conditions, and to establish procedures for the expedited resolution of disputes. 47 U.S.C. § 532(c)(4)(A). At the same time, Congress added a second rationale for leased access: "to promote competition in the delivery of diverse sources of video programming." *Id.* § 532(a), as amended.

■ Time Warner's initial point regarding the leased access provisions[3] is that they should be subject to the most stringent of the standards used to evaluate restrictions on speech. As the company sees it, the provisions are content-based; the government therefore must demonstrate a compelling interest to overcome their presumptive invalidity. *Time Warner I,* 56 F.3d at 182. There is nothing to this. The provisions are not content-based. They do not favor or disfavor speech on the basis of the ideas contained in the speech or the views expressed. *Turner,* —— U.S. at ——, 114 S.Ct. at 2459. Whether, and how many, channels a cable operator must designate for public leasing depends entirely on the operator's channel capacity. *Id.* at ——, 114 S.Ct. at 2460; *see also Time Warner I,* 56 F.3d at 182. What programs appear on the operator's other channels— that is, what speech the operator is promoting—matters not in the least. So too with respect to the speech of those who use the leased access channels. Their qualification to lease time on those channels depends not on the content of their speech, but on their lack of affiliation with the operator, a distinguishing characteristic stemming from considerations relating to the structure of cable

television. *Turner,* —— U.S. at ——, —— ——, —— ——, 114 S.Ct. at 2457, 2460–61, 2467–68; · *Time Warner I,* 56 F.3d at 184. The statutory objective, as well as the provisions carrying it forth, are framed in terms of the sources of information rather than the substance of the information. This is consistent with the First Amendment's "assumption that the widest possible dissemination of information from diverse and antagonistic sources" promotes a free society. *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424–25, 89 L.Ed. 2013 (1945). The Supreme Court has determined that regulations along these lines are content-neutral. *Turner,* —— U.S. at —— —— ——, 114 S.Ct. at 2469–70.

■ Hence the standard must be intermediate scrutiny: it is enough if the government's interest is important or substantial and the means chosen to promote that interest do not burden substantially more speech than necessary to achieve the aim. *Time Warner I,* 56 F.3d at 184. Time Warner thinks the leased access provisions fail even this test. The company's attack is not on the sufficiency of the governmental interest. After *Turner,* "promoting the widespread dissemination of information from a multiplicity of sources" and "promoting fair competition in the market for television programming" must be treated as important governmental objectives unrelated to the suppression of speech. —— U.S. at —— —— ——, 114 S.Ct. at 2469–70. The problems Time Warner sees are elsewhere: there is first the lack of any demonstration that the leased access provisions address a real, non-conjectural harm; and there is second the loose fit between the remedy of setting aside a percentage of channel capacity and the supposed harm. *See id.* at —— —— ——, 114 S.Ct. at 2469–72.

As to the alleged lack of any real harm, the Commission recently said: "Cable operators and leased access programmers agree that relatively little leased access capacity is being used by unaffiliated programmers." *Im-*

---

ing side of the cable industry." H.R. REP. No. 628, *supra,* at 41.

3. Time Warner has limited its challenge to subsections (b)-(d) of 47 U.S.C. § 532 and has

not made any arguments regarding the constitutionality of subsections (h) and (j) addressed in *Denver,* —— U.S. ——, 116 S.Ct. 2374.

*plementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation, Leased Access,* MM Docket No. 92–26, slip op. at 5 ¶ 6 (F.C.C. released Mar. 29, 1996) (order on reconsideration of first report and order and further notice of proposed rulemaking). Four years earlier, the Committee reports accompanying the 1992 Amendments reached the same conclusion. S. REP. No. 92, *supra,* at 30–32, *reprinted in* 1992 U.S.C.C.A.N. at 1163–65; H.R. REP. No. 628, *supra,* at 39–40. When we get to reasons why there have been so few takers, the finger-pointing begins. The unaffiliated programmers blame the operators, claiming that their high rates made leased access unaffordable. *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation, Leased Access,* slip op. at 5 ¶ 6. The "operators claim that the demand for leased access is weak regardless of the leased access rate, because, at least in part, programming production costs are high." *Id.* If we treated this as a factual dispute and tried to resolve it in light of the evidence, we could not do so on the current record. The Committee reports, which side with the unaffiliated programmers, carry weight; but they are basically conclusory, as one would expect. In their brief in this court, the United States and the Commission point to the increasing vertical integration of the cable industry: "[M]any of the most popular cable programming services are owned in whole or in part by cable operators," which gives operators an incentive to favor programmers affiliated with them. Opening Brief for the FCC and the United States at 46–47. A finding in the 1992 Act is more circumspect: vertical integration "could make it more difficult for noncable-affiliated programmers to secure carriage on cable systems." 1992 Act, § 2(a)(5), 106 Stat. at 1460–61. Still, we do not have before us any specific evidence showing either the extent to which operators have refused to carry unaffiliated programmers or the effect of the leased access provisions on the speech of the operators. No section of the statute directly addresses these evidentiary points.

A portion of the *Turner* opinion joined only by four Justices said that in order to justify the provisions requiring cable operators to carry local broadcast stations, the government had to prove that broadcast television would be in jeopardy without the provisions. —— U.S. at ——, 114 S.Ct. at 2472. This factual issue went not to the interest of the government in preserving local broadcasting, but to the need for enacting the must-carry provisions to advance that interest. The plurality also thought that in order to determine whether the must-carry provisions suppressed more speech than necessary, there had to be "findings concerning the actual effects of must-carry on the speech of cable operators and cable programmers...." *Id.* The vote of Justice Stevens, concurring in the judgment but not in this portion of the opinion, formed a majority in favor of remanding the case to the three-judge district court to resolve these factual disputes.

If this were purely an economic regulation subject to rational basis review, we would say that the legislative decision embodied in the leased access provisions "is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 315, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993). But the *Turner* plurality, applying a higher standard of review, believed that factfinding was needed. Suppose we too followed that course and remanded. A series of questions would then present themselves. This is a facial challenge to the constitutionality of the leased access provisions. Should the facts be determined as of the time Congress enacted the provisions? At the time the complaint was filed? At the time of the hearing on remand? Or should the district court consider the state of affairs expected to develop sometime in the future, taking into account rapidly changing technology and new legislation opening up cable operators to greater competition?

■ The parties do not provide answers. Time Warner thinks it sufficient to allege in its brief that there is not now, nor will there be under new FCC regulations, any appreciable demand by unaffiliated programmers for access to cable systems because cable sys-

tems are already carrying a wide variety of programs from diverse sources and because leased access does not make economic sense in light of the costs of production. Brief for Appellants at 67. For the sake of argument, we shall accept this assertion as true. We will assume, in other words, that on remand Time Warner could prove the factual propositions contained in its brief. Would that render the leased access provisions unconstitutional? We think not. If unaffiliated programmers have not and will not lease time on the channels set aside for them—if, in other words, Time Warner made its best case—we fail to see how the company could establish that the provisions violate its First Amendment right to free speech. In *Turner*, there was no doubt that local broadcasting would occupy channels in cable systems; the open evidentiary questions, according to the plurality, were whether this was necessary to preserve local broadcasting and whether the effect would be to force cable operators to drop programs they would otherwise carry. Our case is very different. Under section 532(b)(4), a "cable operator may use any unused channel capacity" set aside for leased access "until the use of such channel capacity is obtained, pursuant to a written agreement, by a person unaffiliated with the operator." That is, if unaffiliated programmers have not and, as Time Warner predicts, will not exploit the leased access provisions, then the provisions will have no effect on the speech of the cable operators. *See Turner,* —— U.S. at ——, 114 S.Ct. at 2456. None of their programming would have to be dropped. The channels set aside for leasing will either be vacant or they will be occupied according to the wishes of the cable operators. The operators' editorial control will remain unimpaired and so will their First Amendment right to determine what will appear on their cable systems.

The same analysis applies to Time Warner's argument that the leased access provisions are not narrowly tailored to achieve their ends. One of the alleged defects stems from the statutory requirement that the larger the number of channels in the system, the greater the number of channels the operator must set aside. 47 U.S.C. § 532(b)(1). The company states that "because a cable system has more channels does not mean there are any more unaffiliated programmers" being excluded, and that "the more channels a cable operator has, the fewer unaffiliated programmers would be excluded from carriage...." Brief for Appellants at 68–69. Yet if this is accurate, operators of large cable systems would scarcely have any customers asking to lease the access channels; and the operators would thus be free to fill the unused capacity as they saw fit.[4]

We therefore see no reason to remand this portion of the case to the district court for factual findings. Time Warner has mounted a facial challenge to the leased access provisions. If it succeeded in establishing that few unaffiliated programmers will take advantage of the provisions, section 532(b)(4) would insulate it and other operators from suffering any infringement of their First Amendment rights.

## V

### PEG PROVISION

Section 611 of the 1984 Cable Act provides that local franchising authorities "may ... require as part of a [cable] franchise ... [or] franchise renewal ... that channel capacity be designated for public, educational, or governmental use." 47 U.S.C. § 531(b). The District Court upheld the "PEG" provision, as it is commonly known, finding: that it was content-neutral and thus subject to intermediate scrutiny, that it served a significant regulatory interest by giving speakers with lesser market appeal access to cable, and that it was narrowly tailored to accomplish

4. Time Warner also posits "a cable operator that voluntarily has carried each and every programmer that asked for carriage up until the point where it had no excess capacity [and yet] still must set aside channels under the leased access system scheme to carry other programming." Brief for Appellants at 70. This seems to assume the opposite of the company's argument that there is no demand for leased access. In any event, Time Warner has mounted a facial constitutional challenge to the leased access provisions. If an individual operator finds itself in the position Time Warner describes, that operator may mount its own as-applied First Amendment challenge. Our decision today deals only with the facial validity of the provisions.

that purpose. *Daniels Cablevision,* 835 F.Supp. at 7.

Since the PEG provision permits, but does not require, franchising authorities to mandate PEG access as a franchise condition, we first ask whether Time Warner's challenge is ripe. The ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). We test ripeness by balancing two factors: the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1516. As to the first of these factors, Time Warner argues that any requirement to carry PEG programming imposed pursuant to the statute is impermissibly content-based and unconstitutional. Because any difference in the ways in which franchising authorities might actually implement the requirement does not affect the First Amendment analysis of this argument, "the issue tendered is a purely legal one," *id.,* and is thus fit for judicial review. Furthermore, Time Warner has provided affidavits describing the impact, in terms of both finances and substantive programming, that the PEG requirements have had on cable operators around the country. The hardship to Time Warner of withholding resolution on the merits, the second of the ripeness factors, is thus clear. We therefore conclude that Time Warner's facial challenge to the constitutionality of this twelve-year-old statute is ripe.

Our decision in *Beach Communications, Inc. v. FCC,* 959 F.2d 975, 984 (D.C.Cir. 1992), is not to the contrary. In *Beach,* we found unripe a First Amendment challenge to the section of the 1984 Cable Act requiring cable operators to obtain a local franchise. In addressing the first of the two ripeness factors, the fitness of the issues for judicial review, we held that because of the wide discretion local authorities enjoy in imposing franchise requirements—and hence, the different burdens that different franchising regimes would impose—a facial First Amendment challenge was not fit for judicial

decision. In one sense, the PEG provision is quite similar to the general franchise requirement found unripe in *Beach*: both depend upon the action of local franchising authorities. In another sense, however, the PEG provision is fundamentally different. Unlike the general requirement that a cable operator obtain a franchise, the PEG provision's grant of authority explicitly focuses on a particular type of speech: public, educational, and governmental programming. Because we can therefore determine that the statute affects the substance of cable operators' speech in a direct way, the PEG provision is more "fit for judicial decision" than the simple franchise requirement.

To prevail in its facial challenge, Time Warner must "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). Except in the case of an overbreadth challenge, which Time Warner does not make here, "a holding of facial invalidity expresses the conclusion that the statute could never be applied in a valid manner." *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 797–98, 104 S.Ct. 2118, 2124–25, 80 L.Ed.2d 772 (1984); *see id.* at 798 n. 15, 104 S.Ct. at 2125 n. 15. Consideration of this standard is somewhat tricky here since rather than *requiring* PEG channel capacity, the statute merely *permits* local franchise authorities to require PEG programming as a franchise condition. In fact, prior to the passage of the 1984 Cable Act, and thus, in the absence of federal permission, many franchise agreements provided for PEG channels. *See, e.g.,* Rhode Island Rules Governing Community Antenna Television Systems § 14.1(b), *cited in Berkshire Cablevision v. Burke,* 571 F.Supp. 976, 987–88 (D.R.I.1983), *vacated as moot,* 773 F.2d 382 (1st Cir.1985). In passing the PEG provision, Congress thus merely recognized and endorsed the preexisting practice of local franchise authorities conditioning their cable franchises on the granting of PEG channel access. *See* H.R. REP. No. 934, *supra,* at 30, *reprinted in* 1984 U.S.C.C.A.N. at 4667. All the statute does, then, is preempt states from prohibiting local

PEG requirements (if any states were to choose to do so) and preclude federal preemption challenges to such requirements, challenges that cable operators might have brought in the absence of the provision. Preemption issues aside, a statute that simply permits franchise authorities to regulate where they had previously done so raises no First Amendment problems unless the localities themselves infringe on cable operators' speech. For this reason, although the concept of an "application" of a federal statute that permits non-federal franchise authorities to act is somewhat unusual, we consider each individual franchise authority's PEG requirements to be an "application" of the statute for purposes of this facial challenge.

 Time Warner must therefore show that no franchise authority could ever exercise the statute's grant of authority in a constitutional manner. We can, of course, imagine PEG franchise conditions that would raise serious constitutional issues. For example, were a local authority to require as a franchise condition that a cable operator designate three-quarters of its channels for "educational" programming, defined in detail by the city council, such a requirement would certainly implicate First Amendment concerns. At the same time, we can just as easily imagine a franchise authority exercising its power without violating the First Amendment. For example, a local franchise authority might seek to ensure public "access to a multiplicity of information sources," *Turner*, — U.S. at —, 114 S.Ct. at 2470, by conditioning its grant of a franchise on the cable operator's willingness to provide access to a single channel for "public" use, defining "public" broadly enough to permit access to everyone on a nondiscriminatory, first-come, first-serve basis. Under *Turner*, such a scheme would be content-neutral, would serve an "important purpose unrelated to the suppression of free expression," *id.*, and would be narrowly tailored to its goal. Time Warner's facial challenge therefore fails.

At oral argument, Time Warner contended that this suit is also an as-applied challenge, alluding to allegedly unconstitutional PEG requirements imposed by specific municipalities. Yet Time Warner styles its complaint as a facial challenge to the statute, failing to name any local franchising authorities as defendants, and seeking relief consisting solely of a declaratory judgment that the *statute* is unconstitutional, along with an injunction against the United States and the Federal Communications Commission. Under these circumstances, we need not address the constitutionality of the PEG requirements imposed by particular local franchising authorities; and we express no view on their constitutionality.

## VI

### THE DBS PROVISIONS

A direct broadcast satellite ("DBS") service utilizes satellites to retransmit signals from the Earth to small, inexpensive terminals. It operates on a specified band of the radio frequency spectrum. The FCC prescribes the manner in which parts of that spectrum are made available for DBS systems. *See* 47 C.F.R. pt. 100. With the emergence of DBS technology, nations of the Western Hemisphere entered into an agreement to assign orbital satellite positions and channels. *See Processing Procedures Regarding the Direct Broadcast Satellite Serv.*, 95 F.C.C.2d 250, 251 (1983). The United States was assigned 32 channels at each of eight orbital positions. *Id.* at 252 n. 4. Through the use of compression technology, one satellite channel can deliver up to four channels of video service. DBS providers are allotted a number of channels of a specified spectrum width.

Section 25 of the 1992 Act provides:

The Commission shall require, as a condition of any provision, initial authorization, or authorization renewal for a provider of direct broadcast satellite service providing video programming, that the provider of such service reserve a portion of its channel capacity, equal to not less than 4 percent nor more than 7 percent, exclusively for noncommercial programming of an educational or informational nature.

47 U.S.C. § 335(b)(1). DBS providers have no editorial control over the educational or informational programming they are required to carry under this provision. *Id.*

§ 335(b)(3). The district court held that section 25 is invalid because the government provided no evidence that regulation of DBS providers is necessary to serve any significant interest. *Daniels Cablevision*, 835 F.Supp. at 8–9.

## A

### RIPENESS

■ We must first address a threshold question of ripeness. PBS argues that the challenge is not ripe because the nature of the regulations will be determined only through further FCC rulemaking. "We test ripeness of this facial, pre-enforcement challenge ... by balancing two factors: the 'fitness of the issue for judicial decision' and the 'hardship to the parties of withholding court consideration.'" *Beach Communications*, 959 F.2d at 984 (quoting *Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. at 1515). We have held that a claim that raises purely legal questions is presumptively fit for judicial review so long as "the challenged policy is ... sufficiently fleshed out to allow the court to see the concrete effects and implications of its decision." *Chamber of Commerce v. Reich*, 57 F.3d 1099, 1100 (D.C.Cir.1995) (internal quotation marks omitted). Thus, "a controversy is ripe if further administrative process will not aid in the development of facts needed by the court to decide the question it is asked to consider." *New York State Ophthalmological Soc'y v. Bowen*, 854 F.2d 1379, 1386 (D.C.Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2448, 104 L.Ed.2d 1003 (1989).

■ Here, we are faced with the purely legal question of whether section 25 presents an unconstitutional infringement on DBS providers' First Amendment rights, which we are able to resolve without further agency action or factual development. Contrary to PBS's contention, *Beach Communications* does not dictate a finding that Time Warner's challenge is unripe. As we noted in our discussion of the PEG provisions, *see* page 971 *supra*, in *Beach Communications*, we found that a First Amendment challenge to a section of the 1984 Act was not ripe because of the broad discretion that local franchising authorities had in "defin[ing] the [cable operators'] duty, and because the justification for that duty will depend on local facts." 959 F.2d at 984. Here, however, the challenge to section 25 does not depend on the nature or amount of the educational or informational programming that DBS providers are required to carry. Thus, because the potential impact on speech is known and a resolution of the claim does not depend on undeveloped facts, the challenge to section 25 is suitable for judicial review; and because the issue is "clearly fit to be heard," we need not consider whether petitioners would "suffer any hardship from our postponing its resolution." *Consolidated Rail Corp. v. United States*, 896 F.2d 574, 577–78 (D.C.Cir.1990).

## B

### MERITS

Time Warner insists, for a variety of reasons, that the DBS set-aside provisions must be subjected to strict scrutiny; it also maintains that we may not consider the government's argument that DBS systems are analogous to broadcast television and therefore subject to no more than heightened scrutiny, because that argument had not been raised before the district court. While it is true that we will not ordinarily entertain an argument that the trial court had no opportunity to consider, the Supreme Court has recognized that "there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below...." *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976).

We have noted that the discretion to consider issues not raised earlier will be exercised

> only in [such] exceptional circumstances ... [as] uncertainty in the state of the law; a novel, important and recurring question of federal law; an intervening change in the law; and extraordinary situations in which review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process.

*Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 & n. 5 (D.C.Cir.1992) (citations omitted). In *Roosevelt*, we considered

an issue raised for the first time on appeal because it was "purely one of law important in the administration of federal justice, and resolution of the issue [did] not depend on any additional facts not considered by the district court." *Id.* The instant case is concerned with the validity of a federal statute governing the application of a new technology of enormous significance. Our resolution of the legal issue presented here does not require the consideration of facts not already in the record, and for us to ignore the obvious similarity between DBS and broadcasting would do nothing to preserve the integrity of the judicial process.

The Supreme Court recognized, in 1969, that because of the limited availability of the radio spectrum for broadcast purposes, "only a tiny fraction of those with resources and intelligence can hope to communicate by radio at the same time...." *Red Lion Broadcasting Co., Inc. v. FCC,* 395 U.S. 367, 388, 89 S.Ct. 1794, 1805, 23 L.Ed.2d 371 (1969). The same is true for DBS today. Because the United States has only a finite number of satellite positions available for DBS use, the opportunity to provide such services will necessarily be limited. Even before the first DBS communications satellite was launched in 1994, the FCC found that "the demand for channel/orbit allocations far exceeds the available supply." *Continental Satellite Corp.,* 4 F.C.C.R. 6292, 6293 (1989). Recently, the last DBS license was auctioned off for $682.5 million, the largest sum ever received by the FCC for any single license to use the airwaves. Mike Mills, *MCI Becomes a Broadcaster,* WASH. POST, Jan. 26, 1996, at A1, A24. As the Supreme Court observed,

> [w]here there are substantially more individuals who want to broadcast than there are frequencies to allocate, it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish.

*Red Lion,* 395 U.S. at 388, 89 S.Ct. at 1806.

■ In such cases, the Court applies a "less rigorous standard of First Amendment scrutiny," based on a recognition that

> the inherent physical limitation on the number of speakers who may use the ...

medium has been thought to require some adjustment in traditional First Amendment analysis to permit the Government to place limited content restraints, and impose certain affirmative obligations, on broadcast licensees.

*Turner,* —— U.S. at ——, ——, 114 S.Ct. at 2456, 2457. Because the new DBS technology is subject to similar limitations, we conclude that section 25 should be analyzed under the same relaxed standard of scrutiny that the court has applied to the traditional broadcast media.

■ Both broadcasters and the public have First Amendment rights that must be balanced when the government seeks to regulate access to the radio spectrum. *Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 102–03, 110, 93 S.Ct. 2080, 2086–87, 2090, 36 L.Ed.2d 772 (1973) ("*DNC*"). Nonetheless, the Supreme Court has held that "[i]t is the right of the viewers and listeners, not the right of the broadcasters, which is paramount.... It is the right of the public to receive suitable access to social, political, esthetic, moral and other ideas and experiences which is crucial here." *Red Lion,* 395 U.S. at 390, 89 S.Ct. at 1806; *accord DNC,* 412 U.S. at 102, 93 S.Ct. at 2086. An essential goal of the First Amendment is to achieve "the widest possible dissemination of information from diverse and antagonistic sources." *FCC v. National Citizens Comm. for Broadcasting,* 436 U.S. 775, 799, 98 S.Ct. 2096, 2114, 56 L.Ed.2d 697 (1978) ("*NCCB*") (quoting *Associated Press,* 326 U.S. at 20, 65 S.Ct. at 1424–25). Broadcasting regulations that affect speech have been upheld when they further this First Amendment goal. For example, in *NCCB,* the Supreme Court recognized that "efforts to enhance the volume and quality of coverage of public issues through regulation of broadcasting may be permissible where similar efforts to regulate the print media would not be." *Id.* at 800, 98 S.Ct. at 2114 (internal quotation marks, citations, and brackets omitted); *see also CBS, Inc. v. FCC,* 453 U.S. 367, 395, 101 S.Ct. 2813, 2829, 69 L.Ed.2d 706 (1981) ("preserv[ation] [of] an uninhibited marketplace of ideas" is proper consideration in imposing public interest obligations on

broadcasters); *FCC v. League of Women Voters,* 468 U.S. 364, 377, 104 S.Ct. 3106, 3116, 82 L.Ed.2d 278 (1984) (Congress may "seek to assure that the public receives through this medium a balanced presentation of information on issues of public importance. . . .").

■ The government asserts an interest in assuring public access to diverse sources of information by requiring DBS operators to reserve four to seven percent of their channel capacity for noncommercial educational and informational programming. Indeed, a stated policy of the 1992 Act is to "promote the availability to the public of a diversity of views and information through cable television and other video distribution media." 1992 Act, § 2(b)(1), 106 Stat. at 1463. This interest lies at the core of the First Amendment: "Assuring that the public has access to a multiplicity of informational sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Turner,* —— U.S. at ——, 114 S.Ct. at 2470.

■ While Time Warner does not dispute the validity of these interests, it asserts that the government made no findings regarding the need for channel set-asides on DBS. We have recognized that "when trenching on first amendment interests, even incidentally, the government must be able to adduce either empirical support or at least sound reasoning on behalf of its measures." *Century Communications Corp. v. FCC,* 835 F.2d 292, 304 (D.C.Cir.1987), *clarified,* 837 F.2d 517 (D.C.Cir.), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). Nevertheless, while it is true that Congress made no specific findings in support of section 25, "Congress is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review." *Turner,* —— U.S. at ——, 114 S.Ct. at 2471 (plurality opinion); *see also Sable Communications,* 492 U.S. at 133, 109 S.Ct. at 2840 (Scalia, J., concurring) ("[n]either due process nor the First Amendment requires legislation to be supported by committee reports, floor debates, or even consideration, but only by a vote"). Indeed,

[s]ound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable.

*Turner,* —— U.S. at ——, 114 S.Ct. at 2471 (plurality opinion).

In this instance, Congress could not have made DBS-specific findings for the simple reason that no DBS system was in operation at the time the 1992 Act was enacted. Congress had to base its decision to require set-asides on its long experience with the broadcast media. In 1967, when it enacted the Public Broadcasting Act, Congress recognized that "the economic realities of commercial broadcasting do not permit widespread commercial production and distribution of educational and cultural programs which do not have a mass audience appeal." H.R. REP. No. 572, 90th Cong., 1st Sess. 10–11 (1967), *reprinted in* 1967 U.S.C.C.A.N. 1799, 1801. Congress noted the same problem in 1989, when it established the National Endowment for Children's Educational Television. *See* S. REP. No. 66, 101st Cong., 2d Sess. 12 (1989), *reprinted in* 1990 U.S.C.C.A.N. 1628, 1639. As the Supreme Court has observed, since 1939, the government has "recogniz[ed] the potential effect of . . . commercial pressures on educational stations" by reserving radio frequencies and television channels for educational use. *League of Women Voters,* 468 U.S. at 367, 104 S.Ct. at 3111.

Section 25, then, represents nothing more than a new application of a well-settled government policy of ensuring public access to noncommercial programming. The section achieves this purpose by requiring DBS providers to reserve a small portion of their channel capacity for such programs as a condition of their being allowed to use a scarce public commodity. The set-aside requirement of from four to seven percent of a provider's channel capacity is hardly onerous, especially in light of the instruction, in the Senate Report, that the FCC "consider the total channel capacity of DBS systems operators" so that it may "subject DBS systems with relatively large total channel capacity to a greater reservation requirement than systems with relatively less total capacity." S.

Rep. No. 92, *supra,* at 92, *reprinted in* 1992 U.S.C.C.A.N. at 1225. Furthermore, a DBS provider "may utilize for any purpose any unused channel capacity required to be reserved under this subsection pending the actual use of such channel capacity for noncommercial programming of an educational or informational nature." 47 U.S.C. § 335(b)(2).

We note, further, that the government does not dictate the specific content of the programming that DBS operators are required to carry. What the Court in *Turner* found to be true with regard to the must-carry rules is just as true for DBS:

> The design and operation of the challenged provisions confirm that the purposes underlying [their] enactment ... are unrelated to the content of speech. The rules ... do not require or prohibit the carriage of particular ideas or points of view. They do not penalize [DBS] operators or programmers because of the content of their programming. They do not compel [DBS] operators to affirm points of view with which they disagree. They do not produce any net decrease in the amount of available speech. And they leave [DBS] operators free to carry whatever programming they wish on all channels not subject to [the set-aside] requirements.

—— U.S. at ——-——, 114 S.Ct. at 2461–62.

■ The Supreme Court found that Congress's "overriding objective in enacting must-carry was not to favor programming of a particular subject matter, viewpoint, or format, but rather to preserve access to free television programming for ... Americans without cable." *Id.* at ——, 114 S.Ct. at 2461. Section 25 serves a similar objective; its purpose and effect is to promote speech, not to restrict it. *Cf. NCCB,* 436 U.S. at 801–02, 98 S.Ct. at 2115. Because section 25 is "a reasonable means of promoting the public interest in diversified mass communications," it does not violate the First Amendment rights of DBS providers. *See id.* at 802, 98 S.Ct. at 2115.

## VII

### Vertically Integrated Cable Company Provisions

Section 19 of the 1992 Act requires the Commission to promulgate regulations to govern the conduct of vertically integrated video programmers—that is, video programmers in which cable operators have "an attributable interest." 47 U.S.C. § 548(c)(2). Time Warner challenges section 19's "program access" provision, which requires the Commission to prohibit vertically integrated video programmers from "discriminat[ing] ... in the prices, terms, and conditions of sale or delivery of satellite cable programming or satellite broadcast programming among or between cable systems, cable operators, or other multichannel video programming distributors, or their agents or buying groups." *Id.* § 548(c)(2)(B). Exempted from this provision are reasonable requirements for creditworthiness, as well as price distinctions resulting from either differences in cost or economies of scale. *Id.* § 548(c)(2)(B)(i)-(iii). Time Warner also challenges section 19's restrictions on exclusive contracts between cable operators and vertically integrated programmers, and between operators and vertically integrated satellite broadcast vendors. For geographical areas served by cable on the statute's effective date, the Act bars exclusive contracts unless the Commission determines, according to enumerated criteria, that the contract is in the "public interest," *id.* § 548(c)(2)(D), (c)(4); for areas not served by cable on that date, the Act prohibits exclusive contracts altogether. *Id.* § 548(c)(2)(C). The district court upheld the vertically integrated programming provisions, finding that they are content-neutral and satisfy intermediate scrutiny. *Daniels Cablevision,* 835 F.Supp. at 7.

We first address the appropriate level of scrutiny. As the district court properly recognized, these provisions are content-neutral on their face, regulating cable programmers and operators on the basis of the "economics of ownership," a characteristic unrelated to the content of speech. *See id.* Relying primarily on *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), Time Warner argues that both provisions should nonetheless be subject to strict

scrutiny because they target a small group of speakers. In *Minneapolis Star*, the Supreme Court invalidated a state "sales and use" tax scheme that excepted periodicals from the general sales tax and that instead imposed a special "use tax" on paper and ink used by periodicals. Because the state effectively gave each publication an annual tax credit of $4,000, most periodicals—all but fourteen of 388 in one year and sixteen of 374 the following—paid no tax. A single large publisher paid roughly two-thirds of the total use-tax revenue. The Supreme Court declared the scheme unconstitutional because it singled out the press and in practical application targeted a small group of newspapers.

In *Turner*, the Supreme Court distinguished the must-carry provisions from the tax scheme in *Minneapolis Star*, noting that the First Amendment does not "mandate[ ] strict scrutiny for [every] speech regulation that applies to one medium (or a subset thereof) but not others." *Turner*, —— U.S. at ——, 114 S.Ct. at 2468. As the *Turner* Court explained, *Minneapolis Star* called for "heightened scrutiny" because the Minnesota tax scheme was "structured in a manner that raised suspicions that [its] objective was, in fact, the suppression of certain ideas." *Id.* The Supreme Court's suspicion that revenue was not the scheme's only goal, and thus that the state aimed the tax at the speech of particular speakers, arose because the state could easily have avoided differential taxation for different newspapers by simply subjecting newspapers to the general sales tax. *See Minneapolis Star*, 460 U.S. at 587–88, 103 S.Ct. at 1373. Because the *Turner* Court had no such suspicions with respect to the must-carry provisions, the Court declined to apply heightened scrutiny, noting that "the differential treatment [was] 'justified by some special characteristic of' the particular medium being regulated." *Turner*, —— U.S. at ——, 114 S.Ct. at 2468 (quoting *Minneapolis Star*, 460 U.S. at 585, 103 S.Ct. at 1372).

The vertically integrated programmer provisions at issue here are likewise "justified by ... special characteristic[s]" of the affected companies: both "the bottleneck monopoly power exercised by cable operators," *Turner*,

—— U.S. at ——, 114 S.Ct. at 2468, and the unique power that vertically integrated companies have in the cable market, *see* S. Rep. No. 92, *supra*, at 25–26, *reprinted in* 1992 U.S.C.C.A.N. at 1158–59. Unlike *Minneapolis Star*, where the state had no constitutionally valid reason for limiting the general revenue-raising statute to so few newspapers, the vertically integrated programming provisions apply to only a limited number of companies for a perfectly legitimate reason: the antitrust concerns underlying the statute arise precisely because the number of vertically integrated companies is small. The vertically integrated programmer provisions are thus not "structured in a manner that raise[s] suspicions that their objective was, in fact, the suppression of certain ideas." *Turner*, —— U.S. at ——, 114 S.Ct. at 2468.

We thus apply intermediate scrutiny, sustaining the statute if " 'it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' " *Turner*, —— U.S. at ——, 114 S.Ct. at 2469 (quoting *O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679). Like one of its interests in the must-carry provision at issue in *Turner*, the government's interest in regulating vertically integrated programmers and operators is the promotion of fair competition in the video marketplace. According to *Turner*, this goal both furthers an important government interest and is unrelated to the suppression of free expression. *Turner*, —— U.S. at ——, 114 S.Ct. at 2469.

Time Warner contends that these provisions are not "narrowly tailored" since they prohibit vertically integrated programmers from favoring, or entering into exclusive contracts with, even *non*-affiliates. The Supreme Court has made clear, however, that to satisfy *O'Brien*'s narrow-tailoring requirement, a statute need not be the "least speech-restrictive means of advancing the government's interests." *Turner*, —— U.S. at ——, 114 S.Ct. at 2469. Rather, "[n]arrow tailoring in this context requires ... that the means chosen ... not 'burden substantially

more speech than is necessary to further the government's legitimate interest.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989)). Both the "program access" provision and the prohibition against exclusive contracts satisfy this standard. Without these provisions, vertically integrated cable operators could favor their affiliates to the disadvantage of other programmers by, for example, giving affiliates preferred channel positions or refusing to carry competitor non-affiliates altogether. *See* S. REP. No. 92, *supra*, at 25–26, *reprinted in* 1992 U.S.C.C.A.N. at 1158–59. That these provisions reach beyond Congress's goal does not mean that they burden substantially more *speech* than necessary, the crucial factor in whether a regulation satisfies "narrow tailoring," since they merely restrict Time Warner's ability to contract freely with non-affiliates. To be sure, because the ability to enter into exclusive contracts could create economic incentives to invest in the development of new programming, prohibiting such contracts might result in reduced programming—that is, less speech. *See, e.g.,* Bigelow Aff. ¶¶ 6, 7, 10. In our view, however, this link between the ability to favor and to enter into exclusive contracts with non-affiliates—the alleged statutory overreach—and any impact on Time Warner's speech is simply too conjectural for us to conclude in a facial challenge that the provisions burden substantially more speech than necessary to achieve the government's goal. Moreover, Congress considered Time Warner's argument and concluded that the benefits of these provisions—the increased speech that would result from fairer competition in the video programming marketplace—outweighed the disadvantages—the possibility of reduced economic incentives to develop new programming. *See* S. REP. No. 92, *supra*, at 26–28, *reprinted in* 1992 U.S.C.C.A.N. at 1159–61. To accept Time Warner's argument and therefore invalidate these provisions would thus require us to reject Congress's policy conclusions and reassess the merits of Time Warner's economic theories. This we decline to do. *See Board of Trustees v. Fox*, 492 U.S. 469, 478, 109 S.Ct. 3028, 3034, 106 L.Ed.2d 388 (1989) (courts should be "loath to second-guess the

government's judgment" on whether a statute burdens substantially more speech than necessary). Given the attenuated nature of the connection between the overreach of these provisions and Time Warner's speech, we therefore conclude that Time Warner has failed to show that the provisions burden "substantially more speech" than necessary. For purposes of Time Warner's facial challenge, the "program access" provision and the prohibition against exclusive contracts thus satisfy the intermediate scrutiny test's "narrow tailoring" requirement.

## VIII

### LIMITATIONS ON OWNERSHIP, CONTROL, AND UTILIZATION

Time Warner challenges three subsections of section 11(c) of the 1992 Act: the "subscriber limitation," the "channel occupancy," and the "program creation" provisions. Rather than imposing any direct requirements on cable, these provisions either require the Commission to promulgate regulations or authorize it to consider the necessity of doing so. The "subscriber limitation" provision requires the Commission to limit the number of cable subscribers any one cable operator may reach. 47 U.S.C. § 533(f)(1)(A). The "channel occupancy" provision requires the Commission to limit the number of channels that vertically integrated programmers may occupy on affiliated cable systems. *Id.* § 533(f)(1)(B). The "program creation" provision directs the Commission to "consider the necessity" of imposing limitations on the degree to which cable distributors may "engage in the creation and production of video programming." *Id.* § 533(f)(1)(C).

The Commission has promulgated regulations pursuant to the "subscriber limitation" and "channel occupancy" provisions. *See Implementation of Sections 11 and 13 of the Cable Television Consumer Protection and Competition Act of 1992: Horizontal and Vertical Ownership Limits*, 8 F.C.C.R. 8565, 8567 (1993) (second report and order) (limiting each cable company to 30% of national cable market and precluding vertically integrated operators from having more than 40%

of channels occupied by affiliated programmers). Time Warner has challenged these regulations in a direct appeal to this court in *Time Warner Entertainment Co. v. FCC,* No. 94–1035, a case currently held in abeyance pending Commission reconsideration. In the interest of judicial economy, we consolidate this challenge to the constitutionality of these two statutory provisions with the challenge to the regulations in No. 94–1035. When filing briefs in that case, both parties should therefore address the constitutionality of the "subscriber limitation" and "channel occupancy" provisions. At this point, we express no opinion as to the constitutionality of either the statute or the regulations.

■ Although the Commission "considered the necessity" of "program creation" limits, it decided no such limits to be necessary at present. 8 F.C.C.R. at 8567–68. Accordingly, Time Warner's challenge to the "program creation" provision, which neither regulates nor requires the Commission to regulate video programming, is not ripe. Unless the Commission actually imposes limitations, the challenge is not "fit for judicial decision," nor will withholding court consideration cause any hardship to Time Warner. *See Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. at 1515–16.

## IX

### MUNICIPAL IMMUNITY

Time Warner also challenges the section of the 1992 Act limiting the remedies in suits against franchising authorities to injunctive and declaratory relief. 47 U.S.C. § 555a(a). The contention is that by prohibiting damages against municipalities, this section prevents cable operators from protecting their First Amendment rights and permits municipal licensing authorities to censor the content of cable operators' speech.

■ Like the district court, we cannot understand how giving local franchising authorities immunity from damages amounts to a direct restriction on the speech of cable operators. *Daniels Cablevision,* 835 F.Supp. at 11. Depriving operators of a damage remedy does not prevent them from showing whatever they please on their cable systems. *See Jones Intercable, Inc. v. City of Chula Vista,* 80 F.3d 320, 325 (9th Cir.1996). It may be that even a facially speech-neutral provision will fall if it is enacted for the manifest purpose of regulating speech because of its message. *Turner,* —— U.S. at ——, 114 S.Ct. at 2461. But nothing of the sort stands behind this legislation. So far as we can tell, Congress gave local franchising authorities protection in order to insulate their decisionmaking from the threats of suits for damages brought by disappointed cable operators. *See* 138 CONG. REC. H6530 (daily ed. July 23, 1992) (statement of Rep. Schumer).[5] The Cable Acts contain extensive restrictions on the discretion of local authorities to award franchises. *See, e.g.,* 47 U.S.C. §§ 541 (General Franchise Requirements), 542 (Franchise Fees), 543 (Regulation of Rates), 544 (Regulation of Services, Facilities, and Equipment), 545 (Modification of Franchise Obligations), 546 (Renewal), 547 (Conditions of Sale).[6] And as the district court held, the declaratory and injunctive relief still permitted under section 24 enables cable operators to protect their First Amend-

5. Time Warner relies on the Senate version of the legislation as evidence that Congress enacted municipal immunity in order to disable cable operators from protecting their First Amendment rights. The Senate version granted damages immunity only to "any claim under the Civil Rights Acts asserting a violation of First Amendment constitutional rights." S. 12, 102d Cong., 1st Sess. § 13 (1991), *reprinted in* 137 CONG. REC. S587 (daily ed. Jan. 14, 1991); *see also* S. REP. No. 92, *supra,* at 49, *reprinted in* 1992 U.S.C.C.A.N. at 1182. The Conference Committee, however, deleted this section and replaced it with the House language, which provided franchising authorities with damages immunity in all actions regardless of their basis. H.R. CONF. REP.

No. 862, 102 Cong., 2d Sess. 98–99 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1231, 1280–81. Unlike the Senate version, nothing on the face of the House version or its legislative history displays discrimination against the speech of cable operators. § 24, 106 Stat. at 1500; 138 CONG. REC. H6530 (daily ed. July 23, 1992) (statement of Rep. Schumer).

6. Although some of these provisions have been modified or effectively repealed by the 1996 Act, §§ 301(b), (c), (e), (h), (j), 303, 304, 110 Stat. at 115–18, 124–25, they still represent a sufficient limit on the franchising authorities' discretion to comport with the First Amendment.

ment rights against any improper actions by franchising authorities. *Daniels Cablevision,* 835 F.Supp. at 11; *see also Jones Intercable,* 80 F.3d at 326–27 (citing *Bush v. Lucas,* 462 U.S. 367, 388, 103 S.Ct. 2404, 2416–17, 76 L.Ed.2d 648 (1983)).

## X

### OBSCENITY LIABILITY

We agree with the district court that the 1992 Act's revocation of cable operators' immunity from liability for obscene programming carried on PEG or leased access channels does not violate the First Amendment. § 10(d), 106 Stat. at 1486 (codified at 47 U.S.C. § 558). Section 10(d) merely imposes upon cable operators the same responsibility that others face. As the district court pointed out, "no speakers—cable operators included—have a constitutional *right* to immunity" from obscenity liability. *Daniels Cablevision,* 835 F.Supp. at 11 (emphasis in original); *see also Sable Communications,* 492 U.S. at 124–25, 109 S.Ct. at 2835–36. Although the 1984 Act initially made cable operators immune from any liability for obscene programming carried on PEG or leased access channels, 1984 Act, § 2, 98 Stat. at 2801, "Congress' earlier decision to provide cable operators with immunity was a matter of grace that it has always been free to rescind." *Daniels Cablevision,* 835 F.Supp. at 11. Cable operators at times may find it difficult to determine which programs are obscene. However, such difficulties arise whenever the government regulates obscene materials; they are insufficient to render an antiobscenity law unconstitutional. *Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 60, 109 S.Ct. 916, 925–26, 103 L.Ed.2d 34 (1989); *Denver,* —— U.S. at ——, 116 S.Ct. at 2390 (plurality opinion).

Time Warner complains that section 10(d) makes cable operators liable for program-

ming the Cable Acts force them to carry. But section 506 of the 1996 Act amended 47 U.S.C. §§ 531(e) and 532(c)(2) to provide explicitly that cable operators may refuse to transmit obscene material on leased access and PEG channels. 1996 Act, § 506, 110 Stat. at 136–37 (to be codified at 47 U.S.C. §§ 531(e), 532(c)(2)). The constitutionality of section 506 is not before us, nor could it be. Constitutional challenges to the 1996 Act must be heard by three-judge district courts in accordance with 28 U.S.C. § 2284. *See* 1996 Act, § 561, 110 Stat. at 142–43. We therefore shall assume the validity of section 506. Because cable operators may, under that provision, refuse to transmit obscenity on PEG and leased access channels, section 10(d)'s revocation of cable operators' obscenity immunity does not make them liable for programming they are forced to carry.[7]

## XI

### PREMIUM CHANNEL NOTICE PROVISION

Premium channels are offered only to those who sign up and agree to pay the extra fee. All other subscribers receive a scrambled signal on the premium channel. As a marketing technique, some cable systems provide free access to a premium channel for a limited time. During the free preview period, all cable subscribers receive the premium channel. Section 15 of the 1992 Act requires operators to give their subscribers thirty days notice before offering free previews of premium channels—defined as "any pay service offered on a per channel or per program basis, which offers movies rated by the Motion Picture Association of America as X, NC–17 or R"—and requires operators to block any preview if the subscriber so requests. 47 U.S.C. § 544(d)(3)(A). The district court struck down section 15 on the ground that it constituted a content-based

---

7. By upholding section 10(a) of the 1992 Act, the Supreme Court's judgment in *Denver* permitted cable operators to prohibit the transmission of obscene (as well as indecent) programming on leased access channels. *See* —— U.S. at —— ——, 116 S.Ct. at 2382–90 (plurality opinion); *id.* at —— ——, 116 S.Ct. at 2422–25 (opinion of Thomas, J., joined by Rehnquist, C.J., and Scalia, J.). The Court's judgment struck down section

10(c), which authorized operators to exert similar control over PEG channels. But the judgment appeared to rest on the principle that indecent material, unlike obscenity, is entitled to some measure of constitutional protection. Section 10(d), of course, deals only with obscene programming. *See id.* at —— n. 14, 116 S.Ct. at 2428 n. 14 (opinion of Thomas, J., joined by Rehnquist, C.J., & Scalia, J.).

982

restriction of speech. *Daniels Cablevision,* 835 F.Supp. at 9–10.

■■■■ Exactly why the court treated the premium channel notice provision as a restriction on speech is unclear. Nothing in section 15 prohibits a cable operator from running any program a subscriber desires. The provision simply requires operators to disclose certain information before offering free previews of premium channels, information that enables parents to decide whether they and their children should tune in. *See Meese v. Keene,* 481 U.S. 465, 480–81, 107 S.Ct. 1862, 1871, 95 L.Ed.2d 415 (1987). If it is constitutionally permissible to require foreign agents to inform American viewers that movies made by foreign governments are "political propaganda," and *Meese v. Keene* held that it is, it is permissible to require a cable operator to disclose to potential viewers that the premium channel it will be providing free of charge shows movies rated X, NC–17, or R.

Parents have a right to control what comes into their homes and what thus becomes available to their children. *Rowan v. Post Office Dep't,* 397 U.S. 728, 736–37, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970). And the government has a substantial interest in facilitating their ability to do so. *Sable Communications,* 492 U.S. at 126, 109 S.Ct. at 2836–37. Advance notice of free previews allows parents to decide if they will allow this type of programming to appear on their television screens. *See FCC v. Pacifica Foundation,* 438 U.S. 726, 748–49, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978). In fact, the premium channel notice provision imposes less of a burden than the safe-harbor restriction upheld in *Pacifica,* 438 U.S. at 732, 98 S.Ct. at 3031. The district court thought that section 15's thirty day notice requirement would make previews "less practicable and more costly." *Daniels Cablevision,* 835 F.Supp. at 9. But operators already communicate with their subscribers on a monthly basis through billing, and the increased costs associated with the advance notice cannot be significant.

The district court also faulted section 15 for its use of the Motion Picture Association's rating system. *Daniels Cablevision,* 835 F.Supp. at 9. There is no doubt that these ratings do not measure which movies are constitutionally protected and which are not. *See, e.g., Gascoe, Ltd. v. Newtown Township,* 699 F.Supp. 1092, 1096 (E.D.Pa.1988); *Motion Picture Ass'n v. Specter,* 315 F.Supp. 824 (E.D.Pa.1970). But there is also no doubt that the ratings supply useful and important information to parents, and to their children, about what to expect. We are dealing with a disclosure statute, not a direct restriction on speech. *See Borger ex rel. Borger v. Bisciglia,* 888 F.Supp. 97, 100–01 (E.D.Wis.1995); *Krizek v. Board of Educ.,* 713 F.Supp. 1131, 1139 (N.D.Ill.1989). The adults in the household still retain the ultimate say; they alone decide whether to accept the free previews into their home.

Time Warner suggests, as did the district court, that "lockboxes" constitute a less intrusive and equally effective method of protecting children. *Daniels Cablevision,* 835 F.Supp. at 10; Reply Brief for Appellants at 38. But this would be so only if parents who had lockboxes—not all do—knew in advance what sort of programs may be carried on a premium channel to which they do not subscribe. *Pacifica,* 438 U.S. at 748–49, 98 S.Ct. at 3040. Otherwise, why would anyone bother to place a lockbox in operation? For parents to make an informed judgment about which course to follow, and when, they must have information in advance, which is what section 15 gives them. *Denver,* —— U.S. at ——, 116 S.Ct. at 2393 (reasoning that informational requirements are a more appropriate complement to lockboxes than segregation and blocking requirements).

Time Warner also believes that annual notice would be sufficient to enable parents to make appropriate choices on behalf of their children. We cannot see how. It must be the rare family indeed that plans its television viewing one year in advance. Annual notice also disregards the possibility that programming inappropriate for a child today might well be appropriate for that same child sometime later. Thirty days notice would allow parents to evaluate the appropriateness of a preview without having to speculate about their children's level of maturity up to one year in the future. Requiring only annu-

al notice would also unduly restrict the ability of programmers to adjust their preview schedule to their business needs and the changing desires of the viewing public. Providing only annual notice would, in short, work to the disadvantage of both speakers and listeners.

\* \* \*

In summary, we sustain the constitutionality of sections 611 and 612 of the 1984 Act and sections 3, 10(d), 15, 19, 24, and 25 of the 1992 Act. We hold unripe the challenge to section 11(c)'s program creation provision and consolidate the remaining challenges to section 11(c) with *Time Warner Entertainment Co. v. FCC,* No. 94–1035.

*So ordered.*

TATEL, Circuit Judge, dissenting in part:

I concur in all of the court's opinion except Part XI, which upholds section 15 of the 1992 Cable Act, the Premium Channel Notice Provision. I agree that the government has a compelling interest in protecting children. *See* Maj. op. at 982; *see also Denver Area Educ. Telecommunications Consortium, Inc. v. FCC,* —— U.S. ——, ——, 116 S.Ct. 2374, 2387, 135 L.Ed.2d 888 (1996). But because I do not believe we can sustain the statute's constitutionality on this record, I respectfully dissent.

Section 15 plainly discriminates among programmers based solely on the content of their speech. While operators must provide thirty days advance notice to all subscribers when offering free previews of "pay service" channels carrying movies rated R, NC–17, or X—a rating system based solely on the movies' content—they need not provide such notice when offering free previews of pay channels not carrying such movies. The court does not dispute this.

Nor could the court deny that section 15 is patently overbroad and underinclusive, and probably does not even accomplish its intended goal—all defects with significant First Amendment implications:

- Section 15 is overbroad because it requires notice to even those customers already subscribing to the "premium channel," as well as notice every time a

premium channel seeks to show a free preview, even a preview with no movies rated R, NC–17, or X. Section 15 would thus require a cable operator offering a free preview of Snow White and the Seven Dwarfs on a "premium channel" to give thirty days advance notice.

- Section 15 is underinclusive because it covers only "pay service" channels, not other stations seeking to show the same movies, *see Daniels Cablevision, Inc. v. United States,* 835 F.Supp. 1, 9 (D.D.C. 1993), and it does not apply to indecent programming not rated by the MPAA, *id.* at 9 n. 16; *see also Denver,* —— U.S. at ——, 116 S.Ct. at 2392 (noting "patently offensive" programming found on both leased access and non-leased access cable channels); *In the Matter of Enforcement of Prohibitions Against the Use of Common Carriers for the Transmission of Obscene Materials,* 2 F.C.C.R. 2819, 2820 (1987) (noting that "non-MPAA member companies ... are not required to have their movies rated" and that "the lack of a rating bears no relationship to the content of a film" (internal quotations omitted)).

- Because section 15 does not require operators to inform subscribers that the term "premium channel" is defined as a channel that shows movies rated R, NC–17, or X, the statute only marginally furthers the government's stated interest of warning parents about indecent programming. *See* 47 U.S.C. § 544(d)(3)(A)(i) (requiring notice that operator will provide premium channel free preview); § 544(d)(3)(A)(ii) (requiring notice of when operator will offer the free preview); § 544(d)(3)(A)(iii) (requiring notice of customers' right to block). Subscribers unaware that "premium channels" show such movies would thus not have the very information the government believes to be so valuable: that the free preview may include materials inappropriate for their children. The Government acknowledges this statutory flaw, stating in its brief that section 15 "simply requires advance notice; the operator is free to describe in any way the programming that is to be previewed

free of charge." Opening Brief for the FCC and the United States at 66 n.21. Section 15 thus "does not reveal the caution and care" First Amendment jurisprudence requires. *Denver*, —— U.S. at ——, 116 S.Ct. at 2392. Were the court to engage in ordinary First Amendment analysis, I have little doubt it would be hard-pressed to uphold section 15 under either strict scrutiny, *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989) (requiring that content-based statute be "least restrictive means to further the articulated interest"), or even the "close judicial scrutiny" standard endorsed by four Justices in *Denver*, —— U.S. at ——, 116 S.Ct. at 2378 (plurality opinion) (invalidating statute if it imposes "unnecessarily great restriction on speech").

The court, however, sidesteps the free expression issues in this case, concluding that because "[n]othing in section 15 prohibits a cable operator from running any program a subscriber desires," Maj. op. at 982, the statute does not restrict speech. To arrive at this conclusion, the court assumes that "the increased costs associated with the advance notice cannot be significant." Maj. op. at 982. Yet the record contains abundant uncontroverted evidence that the costs of notice are not only significant, but also so prohibitive as to make free previews financially impractical. According to the President of Time Warner's Austin Division, for example, "because of the requirements of the 1992 Cable Act regarding free previews, the Austin Division has discontinued all previews of premium services that offer movies rated by the Motion Picture Association of America as X, NC–17[,] or R." Rutledge Aff. ¶ 3. Time Warner's San Diego Division President stated that "[t]he notice, which takes the form of a bill insert, has a cost of between .02¢—.03¢ per subscriber, depending on the number of other bill inserts included in a given month, or a total of between $3,240.00—$4,860.00." Burr Aff. ¶ 3. *See also* Bewkes Aff. ¶ 7; Collins Aff. ¶ 39; Hanson Aff. ¶¶ 4–5; High Aff. ¶¶ 3–4; Mitchell Aff. ¶¶ 3–4; Sharrard Aff. ¶ 2. Thus, the court ignores both the record and, contrary to Supreme Court precedent, the statute's practical effects. *See FEC v. Massachusetts Citizens for Life, Inc.*,

479 U.S. 238, 255, 107 S.Ct. 616, 626, 93 L.Ed.2d 539 (1986) (plurality opinion) ("The fact that [a] statute's practical effect may be to discourage protected speech is sufficient to characterize [it] as an infringement on First Amendment activities."); *American Communications Ass'n v. Douds*, 339 U.S. 382, 402, 70 S.Ct. 674, 686, 94 L.Ed. 925 (1950) ("[T]he fact that no direct restraint or punishment is imposed upon speech … does not determine the free speech question."). The court overlooks "a notion so engrained in … First Amendment jurisprudence that … [the Supreme Court] found it so 'obvious' as to not require explanation": "A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115–16, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (quoting *Leathers v. Medlock*, 499 U.S. 439, 447, 111 S.Ct. 1438, 1443–44, 113 L.Ed.2d 494 (1991)).

The court relies on *Meese v. Keene*, 481 U.S. 465, 480–81, 107 S.Ct. 1862, 1871, 95 L.Ed.2d 415 (1987), for the proposition that "disclosure" statutes do not burden speech. In my view, *Keene* does not so hold. The Supreme Court has long subjected disclosure statutes to serious First Amendment scrutiny. *See, e.g., Riley v. National Fed'n of the Blind*, 487 U.S. 781, 798, 108 S.Ct. 2667, 2678, 101 L.Ed.2d 669 (1988) (subjecting to "exacting First Amendment scrutiny" statute that required professional fundraisers to disclose to potential donors percentage of charitable contributions actually turned over to charity); *Buckley v. Valeo*, 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976) ("[W]e have repeatedly found that compelled disclosure, in itself, can seriously infringe on … the First Amendment."). Moreover, *Keene* did not involve the constitutionality of disclosure requirements. *See Keene*, 481 U.S. at 467, 107 S.Ct. at 1864. *Keene*'s sole issue was the constitutionality of Congress's use of the term "political propaganda" in a statute requiring the labeling of certain films. The Supreme Court simply held that the "mere designation" of a film as "political propaganda" does not pose any "obstacle" to speech,

and thus "places no burden on protected expression." *Id.* at 480, 107 S.Ct. at 1871. *Keene* would be relevant here, as might the Supreme Court's approving reference in *Denver* to "informational requirements," only if section 15 required merely the designation of programs as R, NC–17, or X, either at the time of showing or in some other way that did not burden speech. But section 15 goes beyond requiring labeling. Here we have uncontroverted evidence that by requiring thirty days advance notice, section 15 creates an obstacle to the exercise of free expression by imposing a financial burden on speech, *see Simon & Schuster,* 502 U.S. at 115, 112 S.Ct. at 507–08—a burden so great as to make certain speech, solely because of its content, financially impractical.

Although I dissent from the court's conclusion that the notice requirement does not burden speech, I do not believe the district court should have granted Time Warner summary judgment without affording the Government an opportunity for further discovery. The district court concluded that "[t]he notice requirements make carriage of free previews less practicable and more costly." *Daniels,* 835 F.Supp. at 9. Given the uncontroverted factual record before it, this conclusion was reasonable. But the Government treated Time Warner's affidavits as "going only to support plaintiffs' claims of injury for purposes of establishing jurisdiction," Sitcov Decl. ¶ 3, properly requesting further discovery pursuant to Federal Rule of Civil Procedure 56(f) were the district court to treat any of Time Warner's evidence as relevant to the merits of the case. *See id.* ¶ 4. I would therefore remand for further development of the record on the factual question of whether section 15 imposes financial burdens on Time Warner's speech.