**TIME WARNER ENTERTAINMENT CO., L.P., Appellee,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellant.**

**Association of America's Public Television Stations, et al., Intervenors.**

**Nos. 93–1266, 93–1384, 93–5349, 93–5350 and 93–5351.**

United States Court of Appeals, District of Columbia Circuit.

Feb. 7, 1997.

Before: EDWARDS, Chief Judge, WALD, SILBERMAN, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS and TATEL, Circuit Judges.

*ORDER*

PER CURIAM.

The Suggestions for Rehearing *In Banc* and the response thereto have been circulated to the full court. The taking of a vote was requested. Thereafter, a majority of the judges of the court in regular active service did not vote in favor of the suggestions. Upon consideration of the foregoing, it is

ORDERED that the suggestions be denied.

Circuit Judges WALD and HENDERSON did not participate in this matter.

A dissenting statement of Circuit Judge WILLIAMS, with whom Chief Judge EDWARDS, and Circuit Judges SILBERMAN, GINSBURG and SENTELLE concur, is attached.

WILLIAMS, Circuit Judge, with whom Chief Judge EDWARDS, Judge SILBERMAN, Judge GINSBURG and Judge SENTELLE concur, dissenting from the denial of rehearing in banc:

Although I dissent from the denial of the suggestion for rehearing *in banc,* I do so with genuine uncertainty about the correct outcome. But I believe there were fatal defects in the panel's legal *theory* for upholding the 1992 Cable Act's requirement that direct broadcast satellite ("DBS") providers

set aside several channels for noncommercial programming of an educational or informational nature. *Time Warner v. FCC,* 93 F.3d 957, 973–77 (D.C.Cir.1996). DBS is not subject to anything remotely approaching the "scarcity" that the Court found in conventional broadcast in 1969 and used to justify a peculiarly relaxed First Amendment regime for such broadcast. *Red Lion Broadcasting v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Accordingly *Red Lion* should not be extended to this medium.

If the 1992 Act's content rules for DBS can be sustained at all, in my view it would only be on the theory that the government is entitled to more leeway in setting the terms on which it supplies "property" to private parties for speech purposes (or for purposes that include speech). See, e.g., *Rust v. Sullivan,* 500 U.S. 173, 193, 111 S.Ct. 1759, 1772, 114 L.Ed.2d 233 (1991).

1. *Red Lion*

The panel concluded that DBS is more like broadcasting than like cable, and that therefore *Red Lion* applied. *Time Warner,* 93 F.3d at 975–77. As the *Red Lion* doctrine relies on an idea of extreme physical scarcity,[1] I disagree. The new DBS technology already offers more channel capacity than the cable industry, and far more than traditional broadcasting.[2]

---

**1.** It is possible to read *Red Lion* as applying whenever the demand for the medium exceeds supply when the price is zero, i.e., where the normal market-clearing price would be above zero. But I would be reluctant to impute such reasoning to the Supreme Court. As Judge Bork wrote in *Telecommunications Research and Action Ctr. v. FCC,* 801 F.2d 501 (D.C.Cir.1986),

> It is certainly true that broadcast frequencies are scarce [in the sense that demand would exceed supply if they were being offered free] but it is unclear why that fact justifies content regulation of broadcasting in a way that would be intolerable if applied to the editorial process of the print media. All economic goods are scarce, not least the newsprint, ink, delivery trucks, computers and other resources that go into the production and dissemination of print journalism. Not everyone who wishes to publish a newspaper, or even a pamphlet may do so. Since scarcity is a universal fact, it can hardly explain regulation in one context and not another. The attempt to use a universal

fact as a distinguishing principle necessarily leads to analytical confusion.

*Id.* at 508 (footnotes omitted).

**2.** Even in its heartland application, *Red Lion* has been the subject of intense criticism. Partly this rests on the perception that the "scarcity" rationale never made sense—in either its generic form (the idea that an excess of demand over supply at a price of zero justifies a unique First Amendment regime) or its special form (that broadcast channels are peculiarly rare). And partly the criticism rests on the growing number of available broadcast channels. See *Action for Children's Television v. FCC,* 58 F.3d 654, 672–677 (D.C.Cir.1995) (Edwards, C.J., dissenting); Douglas H. Ginsburg et al., *Regulation of the Electronic Mass Media* 324–25 (2d ed.1991); Harry T. Edwards and Mitchell N. Berman, "Regulating Violence on Television," 89 Nw. U.L.Rev. 1487, 1493–96 (1995). While *Red Lion* is not in such poor shape that an intermediate court of appeals could properly announce its death, we can think twice before extending it to another medium.

DBS is more than an order of magnitude less scarce than traditional broadcasting. Over 50% of the conventional broadcast markets receive fewer than five commercial broadcast channels (including UHF channels), and only 20% receive seven or more. *Programming Practices of Broadcast Television Networks and Affiliates,* 10 FCC Rcd 11951, 11977 (1995). While this number of channels is greater than those available in 1969 when *Red Lion* was decided, see *Syracuse Peace Council v. FCC,* 867 F.2d 654, 684 (D.C.Cir.1989) (Starr, J., concurring), it pales in comparison to cable or DBS. Cable operators currently offer about fifty channels, but compression techniques and new technology may eventually lead to 500 channels or more. See *Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming,* 11 FCC Rcd 2060, 2162 (1995); *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992,* 9 FCC Rcd 4119, 4247 (1994).

DBS has even greater channel capacity. The three orbital slots that permit broadcast throughout the continental United States can accommodate at least 120 video channels each, using existing compression technology, for a total of 360 channels. This does not include the other five orbital slots (4 usable for west coast broadcasting and 1 for east coast broadcasting), *Revision of Rules and Policies for the Direct Broadcast Satellite Service,* 11 FCC Rcd 1297, 1299 (1995); *Continental Satellite Corp.,* 4 FCC Rcd 6292, 6293 (1989), which raise the number of channels available to *480* (4 X 120) for the east coast, and *840* (7 X 120) for the west coast. DBS compression is expected to increase the number of channels fivefold by the year 2000. 11 FCC Rcd at 1299. Currently, there are four DBS providers, each providing between 45 and 75 video channels and up to 30 music channels. "TV's Changing Picture," Consumer Reports 10, 14–15 (December 1996). Thus, even in its nascent state, DBS provides a given market with four times as many channels as cable, which (even without predicted increases in compression) offers about 10 times as many channels as broadcast.

Accordingly, *Red Lion*'s factual predicate—scarcity of channels—is absent here. See, especially, 395 U.S. at 398 n.25, 89 S.Ct. at 1811 n.25 (supplying data for top 10, top 50 and top 100 broadcast TV markets). And the *Red Lion* Court implied that its result would have been different in the absence of such a predicate. *Id.* at 399 n.26, 89 S.Ct. at 1812 n.26 (upholding fairness doctrine despite absence of specific findings by FCC, because objecting broadcasters failed to make a record undermining congressional judgment of. scarcity). Similarly, to the extent that *Turner* distinguishes *Red Lion* on grounds of lack of scarcity in cable, see *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 637, 114 S.Ct. 2445, 2456, 129 L.Ed.2d 497 (1994) (observing that "distinct approach to broadcast regulation rests upon the unique physical limitations of the broadcast medium"), DBS falls on the cable rather than the broadcast side of the line.

*Turner,* to be sure, appears in part to ground its distinction between cable and broadcast on technological characteristics independent. of sheer numbers. "[I]f two broadcasters were to attempt to transmit over the same frequency in the same locale, they would interfere with one another's signals, so that neither could be heard at all." *Id.* But this can hardly be controlling. Alleviation of interference does not necessitate government content management; it requires, as do most problems of. efficient use of resources, a system for allocation and protection of exclusive property rights. See, e.g., Richard B. Stewart, "Regulation in a Liberal State: The Role of Non–Commodity Values," 92 Yale L.J. 1537, 1546 n.34 (1983). A cable operator enjoys property rights in the cables in which he transmits his signal (as well, of course, as in the structures he uses to make the transmission). That is the reason would-be cable operators do not interfere with each other's "signals." If I were to burst into Time Warner's studio full of zest to run my program or attempt to transmit signals through wires owned by a cable operator, I would be guilty of trespass and Time Warner could have me ejected. There is no technological obstacle to applying this regime to the broadcast spectrum; indeed, under the current regime a licensee is subject to legal

sanctions if he broadcasts outside the wavelengths covered by his license.

Accordingly, it seems to me more reasonable to understand *Red Lion* as limited to cases where the number of channels is genuinely low.

2. Validity of the DBS regulations as "content-neutral"?

The panel also justified its decision by analogizing the DBS provision to the must-carry rules, which the Supreme Court in *Turner* classified as content neutral. See *Time Warner,* 93 F.3d at 976 (citing *Turner*'s reference to interest in public access to "a multiplicity of informational sources").

But whereas the must-carry provisions reviewed in *Turner* mandate access for particular *stations* regardless of their programming content, the DBS provision speaks directly to content, creating an obligation framed in terms of "noncommercial programming of an educational or informational nature." 47 U.S.C. § 335(b)(1). As a subject-matter specification, then, the DBS requirement would normally be "content-based" and subject to strict scrutiny if viewed as garden-variety government regulation of speech. See, e.g., *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289–90, 33 L.Ed.2d 212 (1972) (classifying as content-based regulations banning picketing except for labor disputes); see also *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) (invalidating as content-based receipts tax that was imposed on sales of tangible personal property including magazines but excepting "religious, professional, trade or sports" periodicals).

*Turner* hardly provides support for categorical programming requirements of this type, as the Court there took pains to distinguish the must-carry rules from such requirements. 512 U.S. at 648, 114 S.Ct. at 2462 ("[t]he operation of the Act further undermines the [challenging parties'] suggestion that Congress' purpose in enacting must-carry was to force programming of a 'local' or 'educational' content ...."); *id.* at 651, 114 S.Ct. at 2463 ("noncommercial licensees are not required by statute or regulation

to carry any specific quantity of 'educational' programming ...."); cf. *id.* at 643–44 n. 6, 114 S.Ct. at 2460 n. 6 (observing, of rule requiring carriage of those low-power stations that FCC determines " 'address local news and informational needs which are not being adequately served,' " that it appears to "single out certain low-power broadcasters for special benefits on the basis of content."); see also Cass Sunstein, "The First Amendment in Cyberspace," 104 Yale L.J. 1757, 1803 (1995) ("*Turner* certainly does not stand for the proposition that [Congressional set asides of news media channels or mandate of preferential access for public-affairs and educational programming] are constitutional. By hypothesis, any such regulation would be content-based.").

The panel opinion states that Congress's purpose is not to favor particular programming, but to promote "diversified mass communications," 93 F.3d at 977, which would be a content-neutral purpose under *Turner.* I don't see that one can accurately characterize Congress's concern in § 25 as relating merely to *variety* of programming. Rather, § 25 explicitly seeks to advance one particular type of programming—"noncommercial programming of an educational or informational nature." 47 U.S.C. § 335(b)(1); see also H.R. Conf. Rep. 102–862 (1992) U.S.Code Cong. & Admin.News 1992, p.1282 ("[t]he purpose of this section is to define the obligation of [DBS] service providers to provide a minimum level of educational programming"; "[t]he pricing structure was devised to enable national educational programming suppliers to utilize this reserved channel capacity").

Thus, it would appear to me that as a simple government regulation of content, the DBS requirement would have to fall. Or, to put it another way, if this regulation is acceptable, it is hard to see what content regulation (short of viewpoint-based ones) would be impermissible. Perhaps, however, the DBS regulation could be saved as a condition legitimately attached to a government grant. I turn briefly to that subject.

3. *Rust v. Sullivan,* et al.

The government may subsidize some activities and not others. In *Rust v. Sullivan,* the

Court held that Congress could prohibit grantees of federal funds for certain family planning services from using those funds for the "counseling, referral, and the provision of information regarding abortion...." 500 U.S. 173, 193, 111 S.Ct. 1759, 1772, 114 L.Ed.2d 233 (1991). Rejecting arguments that the requirement was unconstitutionally viewpoint-based, the Court stated that the government was "simply insisting that public funds be spent for the purposes for which they are authorized." *Id.* at 196, 111 S.Ct. at 1773–74. In its response to the petition for rehearing, the government makes an oblique allusion to this analysis, suggesting that it was within the government's power to retain control over the "public domain" to have reserved 4-to-7% of channel capacity for itself. Response at 14.

Echoes of this idea can be found in the various opinions in the recent case of *Denver Area Educational Telecommunications Consortium v. FCC,* — U.S. —, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996). Speaking of the rule allowing cable operators to veto indecency on "leased" channels, Justice Breyer (joined in this aspect by Justices Stevens, O'Connor & Souter) stressed that the section merely gave operators permission to "regulate programming that, but for a previous Act of Congress, would have had no path of access to cable channels free of an operator's control." *Id.* at —, 116 S.Ct. at 2386. Part of Justice Breyer's reasoning seems to be that Congress may, in its redistribution away from the cable operators, attach content-based strings to its grant to the lessees. The opinion of Justice Thomas, for himself as well as Chief Justice Rehnquist and Justice Scalia, takes a similar tack, observing that the rights of the petitioners to access to cable have been "governmentally created at the expense of cable operators' editorial discretion." *Id.* at —, 116 S.Ct. at 2424. Compare *Id.* at — — —, 116 S.Ct. at 2407–16 (Kennedy, J., concurring in part and dissenting in part, with whom Gins-

burg, J., joined) (analyzing the provision under the public forum doctrine).[3] And in *Red Lion* itself, the Court used the language of conditioned grants:

> To condition the granting or renewal of licenses on a willingness to present representative community views on controversial issues is consistent with the ends and purposes of those constitutional provisions forbidding the abridgment of freedom of speech and freedom of the press.

395 U.S. at 394, 89 S.Ct. at 1809.

On the other hand, the Court has not clearly committed itself to treating spectrum licenses as conditioned grants. For example, when in *FCC v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), it struck down Congress's ban on editorializing by stations receiving monetary grants from the Corporation for Public Broadcasting, it considered only those grants and found them inadequate to justify the restriction. It did not consider the stations' positions as holders of broadcast licenses.

There is, perhaps, good reason for the Court to have hesitated to give great weight to the government's property interest in the spectrum. First, unallocated spectrum is government property only in the special sense that it simply has not been allocated to any real "owner" in any way. Thus it is more like unappropriated water in the western states, which belongs, effectively, to no one. Indeed, the common law courts had treated spectrum in this manner before the advent of full federal regulation. See *Chicago Tribune Co. v. Oak Leaves Broadcasting Station,* Ill. Circuit Ct., Cook County, Nov. 17, 1926, *reprinted in* 68 Cong. Rec. 215–19 (1926) (recognizing rights in spectrum acquired by reason of investment of time and money in application of the resource to productive use, and drawing on analogy to western water rights law); see also Thomas W. Hazlett, "The Rationality of U.S. Regulation

---

**3.** If spectrum regulation is to be analysed as conditioned grants of government property, of course the analysis should mesh with the public forum doctrine. That doctrine is merely a specialized set of rules limiting the conditions that government may impose on use of its resources, either traditional public fora such as streets, side-

walks or parks, or "designated" public fora, i.e., "property that the State has opened for expressive activity for part or all of the public." *International Soc. for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992).

728

of the Broadcast Spectrum," 33 J.L. & Econ. 133, 149–51 (1990).

Further, the way in which the government came to assert a property interest in spectrum has obscured the problems raised by government monopoly ownership of an entire medium of communication. We would see rather serious First Amendment problems if the government used its power of eminent domain to become the only lawful supplier of newsprint and then sold the newsprint only to licensed persons, issuing the licenses only to persons that promised to use the newsprint for papers satisfying government-defined rules of content. See Matthew L. Spitzer, "The Constitutionality of Licensing Broadcasters," 64 N.Y.U. L.Rev. 990, 1041–66 (1989). The government asserted its monopoly over broadcast spectrum long before the medium attained dominance, making the assertion of power seem modest and, by the time dominance was manifest, normal. While this sequence veiled the size and character of the asserted monopoly, it is not clear why it should justify an analysis any different from what would govern the newsprint hypo.

If the subsidy model is suitable for spectrum, the DBS licenses are properly viewed as subsidies, even though there is no cash transfer to the DBS providers for the support of educational programming. The character varies depending on whether the license was granted free, or in an auction occurring after the enactment of the 1992 Act. (There appear to be no licenses auctioned *before* the 1992 Act.) As for DBS providers that received their licenses gratis, the subsidy is clear, although it is troubling that all the DBS providers that did so received them before the condition was attached.

There is also a subsidy in the auction setting. Those bidding for the DBS channels necessarily discounted their bids in light of the known prospect that a portion of the channels would be allocated for educational programming (and that the DBS provider would bear at least some of the operating costs and overhead). This differential—money that the government could have received had it not imposed the programming require-

ment—constitutes a subsidy exactly matching the pecuniary burden imposed by the provision. Thus the government may be said to have given the educational channels to the DBS providers.

Analogizing from *Rust v. Sullivan,* then, the government may argue that it has not required "the [licensee] to give up [non-educational] speech . . .," but simply to use those channels granted by the government for educational and informational programming for that "specific and limited purpose." 500 U.S. at 196, 111 S.Ct. at 1774.

Because I can see no principled basis for upholding the requirements imposed on DBS operators without resolving these questions, I dissent from the denial of the petition for rehearing *in banc.*